2014-1814

NONCONFIDENTIAL

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SWIFF-TRAIN CO., METROPOLITAN HARDWOOD FLOORS, INC., BR CUSTOM SURFACE, REAL WOOD FLOORS, LLC, GALLEHER CORP., DPR INTERNATIONAL, LLC,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

THE COALITION FOR AMERICAN HARDWOOD PARITY,

Defendant-Appellee.

---

Appeal from the United States Court of International Trade in case no. 12-cv-00010, Senior Judge R. Kenton Musgrave.

---

## NONCONFIDENTIAL BRIEF OF DEFENDANT-APPELLEE UNITED STATES

DOMINIC L. BIANCHI
General Counsel
Telephone (202) 205-3061

ANDREA C. CASSON
Assistant General Counsel
for Litigation
Telephone (202) 205-3105

DAVID B. FISHBERG
Attorney Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW, Suite 614
Washington, DC  20436
Telephone (202) 708-2614

Dated: January 28, 2015

Material has been deleted from pages 5, 7-8, 11, 13-16, 46-47, 49-51, 53, and 56 of the Commission's nonconfidential brief because the material is deemed confidential business information pursuant to 19 U.S.C. § 1677f;  see also 19 C.F.R. § 207.7.  The information omitted from pages 5, 7-8, 11, 16, 47, and 51 reflects specific financial information that the domestic industry has treated as confidential.   The material omitted from pages 11, 13-15, 46, 49-50, and 53 reflects specific information on market shares, shipments, and production that the parties treated as confidential.  The material omitted from page 53 reflects specific pricing information that the parties treated as confidential.   The material omitted from page 56 reflects specific information regarding nonsubject sources that the parties treated as confidential.

## TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES .................................................................1

STATEMENT OF THE ISSUE...........................................................................2

STATEMENT OF THE CASE.............................................................................2

STATEMENT OF FACTS ...................................................................................4

I.   The Commission's Initial Determination. ...........................................4

II.  First Decision of the Court of International Trade. .............................9

III. The Commission's Remand Determinations....................................10

IV. The Second Decision of the Court of International Trade. ...............17

SUMMARY OF ARGUMENT .........................................................................19

ARGUMENT .....................................................................................................23

I.   Standard of Review.............................................................................23

II.  As the CIT Correctly Concluded, the Commission Reasonably
     Found the Domestic Industry Materially Injured by
     Reason of Subject Imports..................................................................25

     A.    The Commission's Analysis of the Effects of the
           Subject Imports Comported with its Legal Obligations. ........27

           1.   Statutory Requirements. ...................................................27

                a.   General Statutory Requirements.........................27

                b.   The Commission Adhered to the Proper
                     "By Reason of" Standard...................................29

# TABLE OF CONTENTS CONT'D

**Page**

2. The Commission May Use Any Reasonable
   Methodology to Assess Causation...................................................34

3. The Commission Employed a Reasonable and
   Statutorily-Consistent Methodology Here.......................................37

   a. Appellants' Argument Largely Rests on
      Inapplicable Case Law.......................................................37

   b. To the Extent Appellants Discuss the
      Applicable Statute and Case Law, they
      Misconstrue the Statute and Court Decisions....................39

   c. Appellants' Efforts to Impose Their Own
      Preferred Counterfactual Methodology
      On the Commission is Unavailing......................................41

B. Substantial Evidence on the Record Supports
   the Commission's Determination. ........................................45

   1. The Court Should Affirm the Commission's
      Determination as Supported by Substantial Evidence......................45

   2. Appellants' Efforts to Undermine the Commission's
      Reasonable Factual Findings are Unavailing. ..................................48

      a. The Commission's Findings Regarding the
         Relationship between Demand and the
         Industry's Condition are Supported by
         Substantial Evidence..........................................................48

      b. The Commission's Findings Regarding
         Product Substitutability are Supported by
         Substantial Evidence..........................................................52

      c. The Commission's Findings Concerning the
         Non-attribution of Injury Caused by
         Non-Subject Imports are Supported by
         Substantial Evidence..........................................................54

CONCLUSION .................................................................................57

ii

# TABLE OF AUTHORITIES

**Page**

## Cases

*ALTX, Inc. v. United States*,
  370 F.3d 1108 (Fed. Cir. 2004) ................................................................*passim*

*Am. Lamb Co. v. United States*,
  785 F.2d 994 (Fed. Cir. 1986) ..........................................................................29

*Angus Chem. Co. v. United States*,
  140 F.3d 1478 (Fed. Cir. 1998) ........................................................................28

*Asociacion De Productores De Salmon Y Trucha De Chile AG*,
   26 CIT 29, 180 F. Supp. 2d 1360 (2002) ..........................................................32

*Atlantic Sugar, Ltd. v. United States*,
  744 F.2d 1556 (Fed. Cir. 1984) ........................................................................23

*Bratsk Aluminum Smelter v. United States*,
  444 F.3d 1369 (Fed. Cir. 2006),
  *reh'g en banc denied* (Jul. 24, 2006) ..............................................................55

*Chaparral Steel Co. v. United States*,
  901 F.2d 1097 (Fed. Cir. 1990), reh'g denied (May 29, 1990) ........................29

*Circular Seamless Stainless Steel Hollow Products from Japan*,
  Inv. No. 731–TA–859 (Remand), USITC Pub. 3475 (Dec. 2001) ....................44

*Cleo Inc. v. United States*,
  501 F.3d 1291 (Fed. Cir. 2007) ........................................................................24

*Comm. for Fairly Traded Venezuelan Cement v. United States*,
  372 F.3d 1284 (Fed. Cir. 2004) ........................................................................29

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ..........................................................................................23

*Consolo v. Fed. Maritime Comm'n*,
  383 U.S. 607 (1966) ..........................................................................................24

## TABLE OF AUTHORITIES CONT'D

*Gerald Metals, Inc. v. United States*,
    132 F.3d 716 (Fed. Cir. 1997) .................................................................*passim*

*Gross v. FBL Financial Servs., Inc.*,
    557 U.S. 167 (2009).........................................................................................39

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984) ..................................................................24, 48

*Mitsubishi Heavy Indus., Ltd. v. United States*,
    275 F.3d 1056 (Fed. Cir. 2001) ........................................................................24

*Mittal Steel Point Lisas Ltd. v. United States*,
    542 F.3d 867 (Fed. Cir. 2008) .................................................................*passim*

*Nippon Steel Corp.* v. Int'l Trade Comm'n,
    345 F.3d 1379 (Fed. Cir. 2003) ..................................................................31, 32

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ...............................................................*passim*

*Nucor Corp. v. United States*
    414 F.3d 1331 (Fed. Cir. 2005) ........................................................................36

*Nucor Corp. v. United States*,
    601 F.3d 1291 (Fed. Cir. 2010) ........................................................................34

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1998).........................................................................................38

*Suramerica de Aleaciones Laminadas, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994) ...........................................................................23

*Swiff-Train Co. v. United States*,
    904 F. Supp. 2d 1336 (Ct. Int'l Trade 2013) ..............................................*passim*

*Swiff-Train Co. v. United States*,
    999 F. Supp. 2d 1334 (Ct. Int'l Trade 2014) ..............................................*passim*

*Taiwan Semiconductor Indus. Ass'n. v. Int'l Trade Comm'n*,
    266 F.3d 1339 (Fed. Cir. 2001) ........................................................................32

# TABLE OF AUTHORITIES CONT'D

*Timken U.S. Corp. v. United States*,
421 F.3d 1350 (Fed. Cir. 2005) ........................................................25

*U.S. Steel Grp. v. United States*,
96 F.3d 1352 (1996).................................................................*passim*

*University of Texas Southwestern Medical Center v. Nassar*,
133 S.Ct. 2517 (2013)...................................................................39

*Zenith Radio Corp. v. United States*,
437 U.S. 443 (1978).....................................................................35

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..........................................................23

19 U.S.C. § 1675a.........................................................................43

19 U.S.C. § 1677(7) ......................................................................20

19 U.S.C. § 1677(7)(A)..................................................................27

19 U.S.C. § 1677(7)(B)(i) ...............................................................27

19 U.S.C § 1677(7)(C)(i)-(iii)...........................................................27

19 U.S.C. § 1677(C)(i)...................................................................30

19 U.S.C. § 1677(C)(ii)..................................................................30

19 U.S.C. § 1677(C)(iii).................................................................30

19 U.S.C. § 1677f(i)(3)(B)...............................................................25

19 U.S.C. § 2252(b)(1)(B) ..............................................................33

19 U.S.C. § 3512(d) ......................................................................25

28 U.S.C. § 2639(a)(1)...................................................................23

**Legislative History**

H.R. Rep. No. 96-317 (1979)....................................................28, 32, 33

## TABLE OF AUTHORITIES CONT'D

H.R. Rep. No.103-316 (1994)................................................................24, 32, 33, 34

S. Rep. No. 96-249 (1979) ...................................................................*passim*

## STATEMENT OF RELATED CASES

As stated in the brief filed by plaintiffs-appellants Swiff-Train Co.,

Metropolitan Hardwood Floors, Inc., BR Custom Surface, Real Wood Floors,

LLC, Galleher Corp., and DPR International, LLC (collectively, "Appellants"), no

appeal concerning this matter has previously been before this or any other

appellate court.  Counsel for the U.S. International Trade Commission

("Commission') is not aware of any case pending in this or any other court that

will directly affect or be directly affected by the Court's decision in the pending

appeal.

## STATEMENT OF THE ISSUE

Whether the Commission's remand determination finding that the domestic industry producing multilayered wood flooring ("MLWF") was materially injured by reason of subject imports from China was supported by substantial evidence and in accordance with law.

## STATEMENT OF THE CASE

Appellants failed to provide the Court with a "Statement of Facts," and instead provided a lengthy and argumentative "Statement of the Case."  In order to accurately describe the procedural history of this case, the Commission sets out below its own "Statement of the Case," followed by a "Statement of the Facts" that describes the relevant facts underlying the Commission's determination and the decisions of the U.S. Court of International Trade ("CIT").

On October 21, 2010, the Coalition for American Hardwood Parity ("CAHP"), an *ad hoc* association of U.S. manufacturers of MLWF, filed antidumping and countervailing duty petitions alleging material injury and threat of material injury to a domestic industry by imports of MLWF from China that were being sold in the U.S. market at less than fair value ("LTFV") and subsidized by the Government of China.  On November 2011, the Commission determined that an industry in the United States was materially injured by reason of imports of MLWF from China that the Department of Commerce ("Commerce") had

2

determined were sold in the United States at LTFV and/or subsidized by China.[1]

Appellants, importers of the subject merchandise, appealed the Commission's

affirmative determinations to the CIT. The CIT remanded four issues and affirmed

all other aspects of the Commission's determinations. *Swiff-Train Co. v. United*

*States*, 904 F. Supp. 2d 1336, 1338 (Ct. Int'l Trade 2013) ("*Swiff-Train*")

("Remand Order")[2] During the remand proceedings, the Commission solicited and

considered written comments from Appellants and other parties. The Commission

issued its Remand Views on September 30, 2013.[3] In the Remand Views, the

Commission addressed each remanded issue in detail, and again determined that

the domestic industry was materially injured by reason of subject imports from

China.[4] On July 16, 2014, the CIT affirmed the Commission's Remand Views and

entered final judgment. *Swiff-Train Co. v. United States*, 999 F. Supp. 2d 1334,

---

[1] In the underlying investigations, four Commissioners made affirmative material injury determinations, while two made negative determinations.

[2] Specifically, the CIT remanded for the Commission to (1) analyze and reconsider "its decision not to investigate domestic producers of hardwood plywood used for flooring"; (2) "make findings on the issue of price suppression/depression"; (3) "re-evaluate whether the subject imports were a 'but-for' cause of material injury to the domestic industry"; and (4) explain "the impact the subject imports had on the domestic industry in light of {the} collapse of the housing market during the period of investigation." *Swiff-Train*, 904 F. Supp. 2d at 1338.

[3] The Remand Views reflected the opinion of Chairman Broadbent, Vice Chairman Pinkert, and Commissioners Williamson, Johanson, and Aranoff (Commissioner Pearson dissenting).

[4] This brief refers to the confidential versions of the Initial Views and Remand Views. Citations to pages of the Joint Appendix are designated with the prefix "JA".

(Ct. Int'l Trade 2014) ("*Swiff-Train II*").  On September 8, 2014, Appellants filed their appeal to this Court.

## STATEMENT OF FACTS

In reaching its conclusion in its Remand Views that an industry in the United States was materially injured by reason of subject MLWF imports from China, the Commission adopted essential parts of its initial Views, including the discussions of the pertinent legal standards, and its findings, *inter alia*, on conditions of competition, volume, price effects, and impact, as further supplemented and/or explained in its Remand Views.  JA 1554.  Since the Commission's Remand Views incorporate parts of the Original Views, we discuss both sets of Views below in order to facilitate a comprehensive understanding of the Commission's findings.

### I.     The Commission's Initial Determination.

During the investigation, the Commission examined the effects of the subject imports on the domestic industry during the period of investigation ("POI"), which covered 2008-2010 as well as the first half of 2011.  In its initial determination, the Commission found that the volume of MLWF imported into the United States from subject producers in China was significant, both in absolute terms and relative to consumption and production in the United States, and that the increase in subject import volume relative to domestic production and apparent

4

CONFIDENTIAL BUSINESS
INFORMATION DELETED

consumption was also significant.  JA 1532-34.  The Commission also found that

the significant and growing volume of low-priced subject imports of MLWF from

China competed directly with the domestic like product, and undersold the

domestic like product at significant margins, causing domestic producers to lose

revenue and market share and leading to evidence of adverse effects on the

domestic industry's prices.  JA 1534-42.[5]  Next, the Commission found that

imports of MLWF from subject producers in China had a significant adverse

impact on the domestic industry during the POI.  JA 1543.  The Commission noted

that almost all of the domestic industry's performance indicators declined

significantly from 2008 to 2009, and although these indicators improved somewhat

from 2009 to 2010, they remained at lower levels in 2010 than in 2008.  JA 1543 .

The Commission also observed that the domestic industry's financial condition

was poor over the period examined, with operating losses [[

                ]].  JA 1545.

    Finally, the Commission considered whether there were other factors that

had an impact on the domestic industry. [6] JA 1545-51.  The Commission

acknowledged that the general economic downturn and declining demand for

---

[5] The Commission also found evidence that low priced imports of MLWF from
China depressed prices of the domestic like product in the U.S. market.  JA 1542.
[6] Although the Commission made detailed findings on several issues, because
Appellants' appeal to this Court challenges solely causation, the Commission will
focus its summary of the facts on its findings and analysis related to causation.

MLWF contributed to the domestic industry's deteriorating performance in 2008 to 2009, but the Commission found that the decline in demand associated with the downturn worked hand in hand with the subject imports to cause the domestic industry's deteriorating performance. JA 1545-46. The Commission noted that the domestic industry's performance was poor throughout the period of investigation, including prior to the drop in demand, as subject imports held a very substantial share of the U.S. market from the beginning. JA 1546. Moreover, the Commission found that the domestic industry's loss of market share to subject imports was not a function of demand.[7] JA 1546.

The Commission also analyzed why any apparent improvements in the domestic industry's condition during the latter part of the period did not sever the causal connection between the injury suffered by the domestic industry and the subject imports, as they generally lagged behind the U.S. market's general recovery. JA 1546. After reviewing the record, the Commission concluded that the "improvement" in the domestic industry's losses between 2009 and 2010 was less due to enhanced sales related to a general economic recovery than it was due

---

[7] The Commission also examined substitute products, which respondents claimed compete directly with the domestic like product and had taken away substantial market share from the domestic industry producing MLWF. Contrary to respondents' assertions regarding the role of substitute products, the Commission stated that the record data showed that MLWF maintained its share of the overall floor coverings market relative to other substitute products during the POI. JA 1545.

to the severe measures the domestic industry took to remain competitive in the face
of significant volumes of low-priced subject imports entering the U.S. market.  JA
1547.  Further, the Commission stated that the "improvement" in operating losses
between interim 2010 and interim 2011 was largely due to the improved
performance of [[                                                                                                     ]],
which decided to [[

                                                                                                     ]] during
this period, while increasing considerably its imports of subject MLWF.  JA 1548-
49.

     The Commission also closely examined the role of nonsubject imports in
these investigations.[8]  After noting the primary sources of nonsubject imports, the
Commission stated that, unlike subject imports, nonsubject imports declined

---

[8] Commissioner Pinkert was among the four-Commissioner majority making
affirmative determinations in the MLWF investigations.  Unlike his colleagues,
when considering present material injury in cases involving a commodity and
significant price-competitive nonsubject imports, he considers whether nonsubject
imports would have replaced subject imports during the period without a
continuing benefit to the domestic industry.  Based on the record of these
investigations, he found that price competitive non-subject imports were a
significant factor in the U.S. market during the period of investigation, but that
MLWF was not a commodity product.  JA 1550 n.245.  He further found that had
subject imports exited the U.S. market during the period, non-subject imports
would not have replaced subject imports without a benefit to the domestic industry.
*Id.*  Moreover, Commissioner Pinkert observed that non-subject imports did not
constitute more than 16.1 percent of the U.S. market during the period, both the
volume and market share of such imports declined, and that there was no
information on the record to indicate that they could have increased so as to
replace subject imports.  *Id.*

overall during the investigation period, both in absolute and relative terms.[9]  JA 1550-51.

In sum, the Commission stated:

> Consequently, the picture emerges of a domestic industry (1) with a steadily declining market share due primarily to the significant volume of subject imports from China that is increasing significantly relative to domestic production and apparent U.S. consumption, (2) that face significant underselling by MLWF imported from producers of subject merchandise in China and indications of depressed pricing, (3) that has disproportionately borne the burden of economic downturns while not sharing proportionately in improvements in market conditions, (4) that consistently [[
>
> ]], (5) that experienced steep declines in employment and wages, and (6) whose apparent recent financial improvements were driven in large part by [[                            ]] partial abandonment of domestic production capacity in favor of low-cost subject imports and asset impairments.  Based on all of the foregoing trends, we find that there is a causal nexus between subject imports and the poor condition of the domestic industry and that the domestic industry is materially injured by reason of subject imports.

JA 1551.  The Commission's final affirmative injury determination was published in the Federal Register on December 7, 2011.  JA 698.

---

[9] The Commission noted that respondents conceded that MLWF was not a commodity product, and disagreed with respondents' argument that the Commission was legally required to make a counterfactual showing to satisfy the causation standard.  JA 1550.

## II.    First Decision of the Court of International Trade.

Pursuant to Rule 56.2 of the CIT, Appellants challenged the Commission's final affirmative decision.  JA 699-700.  On March 20, 2013, the CIT remanded four issues and affirmed all other aspects of the Commission's determinations. *Swiff-Train,* 904 F. Supp. 2d at 1348.  With respect to causation, which is the issue before this Court, the CIT acknowledged that the Commission addressed other factors that might have had an effect on the domestic industry during the POI, and affirmed the Commission's analysis of the role of nonsubject imports, as well as the Commission's analysis of substitute flooring products.[10]  The CIT, however, found the Commission's determinations to be "unsupported by substantial evidence because the Commission failed to adequately consider the effect that the severe disruption of the home building and remodeling industries had on the domestic like product industry."  *Swiff-Train* 904 F. Supp. 2d at 1346.  According to the CIT, the Commission "needs to ensure that the subject imports, as compared

---

[10] In their initial appeal, Appellants disputed only the Commission's analysis of nonsubject imports and substitute flooring products.  They argued that judicial precedent required the Commission to conduct a replacement-benefit analysis of nonsubject imports.  The CIT rejected their argument.  *Swiff-Train* 904 F. Supp. 2d at 1347 (finding Appellants' "replacement" argument to be "speculative and not well-suited to the facts in this case.").  The CIT also affirmed the Commission's analysis of substitute flooring products.  *Id.* at 1342 n.5 (noting that Appellants had disputed "the Commission's refusal to find that the subject MLWF replaced non-MLWF products, but the court finds that the decision was supported by substantial evidence.").

9

to other economic factors affecting the domestic industry, were not {sic} a but-for

cause of the injury." *Id.* at 1347.

### III.    The Commission's Remand Determinations.

On remand, the Commission responded in detail to the CIT's concerns

regarding causation.  The Commission first explained that the record did not

support respondents' view that there was only attenuated competition between

subject imports and the domestic like product.  JA 1588-89.  On the contrary,

questionnaire data showed substantial overlap between subject imports and the

domestic like product in all channels of distribution for MLWF (*i.e.*, to

distributors, big box/home centers, builders, and other retailers).  JA 1589.  As the

Commission further found, the record also showed substantial overlap among the

products supplied to the U.S. market by the domestic industry and importers of

subject merchandise in terms of species, plies, widths, interlocking technology, and

hand-scraping features.  JA 1590.

The Commission found that, by underselling the domestic like product at

significant margins with highly substitutable products and by competing in the

same geographic markets and channels of distribution, subject imports maintained

a significant volume absolutely and relative to U.S. consumption, increased

significantly relative to domestic production, and captured significant market share

from the domestic industry.  JA 1580-81.  As the Commission further observed,

regardless of whether apparent U.S. consumption was increasing or decreasing,

subject imports continued to gain market share, capturing significant market share

from the domestic industry through significant underselling.  JA 1581.

The Commission also observed that almost all of the domestic industry's

performance indicators declined significantly from 2008 to 2009, and pointed out

that even those factors that appeared to improve somewhat between 2009 and 2010

were lower in 2010 than in 2008.  JA 1583-84.  By underselling the domestic like

product at significant margins during the period of investigation, subject imports

increased their market share from [[      ]] percent to [[      ]] percent; conversely,

the domestic industry's market share steadily declined from [[      ]] percent in

2008 to [[      ]] percent in 2010, and [[      ]] percent in interim 2011.  JA 1581

n.133 & 1584 n.145.  The Commission found that, faced with declining U.S.

shipments and lower net sales, the domestic industry had to reduce its overall

production capacity, produce less, and operate at low capacity utilization levels.

JA 1584.

Further, as the Commission explained, the domestic industry's financial

condition was poor over the POI.  The domestic industry's net sales value fell,

which the Commission found was consistent with its findings of lost sales and

lower prices due to low-priced subject imports.  The domestic industry had annual

operating losses of [[                              ]].  JA 1585 n.152.  Its

employment levels dropped consistently during the POI.  JA 1585.  Having

considered the volume of subject imports, their effect on prices of the domestic

like product, and their impact on the domestic industry within the context of the

business cycle and relevant conditions of competition, the Commission found the

domestic MLWF industry was materially injured by reason of subject imports from

China.  JA 1586.

Next, the Commission stated that it understood its burden under *Mittal Steel*

*Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008), "is to identify

substantial evidence in the record demonstrating the domestic industry is

materially injured by reason of subject imports notwithstanding any record

evidence of other factors that might also be having adverse effects on the industry

at the same time."  JA 1583 n.142.  As set out in its Remand Views, the

Commission complied fully with the pertinent legal precedent and the CIT's order

to ensure that the industry was materially injured "by reason of subject imports."

In accordance with the CIT's remand order, the Commission again considered the

role of demand and, as discussed below, reasonably explained with citations to

record evidence why demand conditions did not break the causal link between

subject imports and the material injury to the domestic industry.

At the outset, the Commission acknowledged that demand declined overall

during the POI.  JA 1592.  It nonetheless explained that subject imports maintained

CONFIDENTIAL BUSINESS
INFORMATION DELETED

a significant volume and increased significantly relative to domestic production

and consumption by underselling the domestic like product at significant margins

regardless of demand conditions.  The Commission found that the domestic

industry performed poorly throughout the POI during this time of overall declining

demand.  At the same time, the declines in many of the domestic industry's

performance indicators generally exceeded the 9.2 percent demand decline during

this period.  JA 1593-94 & n.192 (noting, *e.g.*, that the domestic industry's U.S.

shipments declined [[      ]] percent, its production declined [[       ]] percent, its net

sales quantities declined [[      ]] percent, and its net sales values declined [[      ]]

percent).  Because the [[    ]] percent overall decline in the absolute volume of

subject imports was significantly less than the [[    ]] percent decline in apparent

U.S. consumption, subject imports were able not only to maintain their share of the

declining U.S. market but also to increase it significantly over the POI.  Thus, the

Commission found that the domestic industry's loss of market share to unfairly

traded subject imports from China that significantly undersold the domestic like

product throughout the POI was not a function of demand.  JA  1594.

Responding to Appellants' emphasis on the apparent consumption data for

certain periods, the Commission assessed the relative effects of demand and

subject imports during those periods -- 2008-2009 and January 2009 to June 2011.

In doing so, the Commission refuted Appellants' claims that the demand data for

CONFIDENTIAL BUSINESS
INFORMATION DELETED

these periods established that there was no causal link between subject imports and the material injury to the domestic industry.

Specifically, the Commission examined the relationship among all factors affecting the market, and found that declines in demand did not account for all of the declines in the domestic industry's performance. In this regard, the Commission observed that the declines in the domestic industry's 2008 to 2009 performance indicators generally exceeded the 15.7 percent decline in demand between 2008 and 2009. JA 1595 & n.197 (noting that the domestic industry's U.S. shipments declined [[     ]] percent, its production declined [[     ]] percent, its net sales quantities declined [[     ]] percent, and its net sales values declined [[     ]] percent during this period). Moreover, the Commission noted that the subject imports' [[     ]] percent overall decline in U.S. shipments was less than the decline in demand. JA 1595 & n.198. As a result, during this period of declining demand, subject imports significantly increased their share of the U.S. market to the detriment of the U.S. industry. JA 1595. Accordingly, the Commission reasonably concluded that the domestic industry's loss of market share to unfairly traded subject imports that significantly undersold the domestic like product between 2008 and 2009 could not be described as a function of demand. Thus, notwithstanding demand declines between 2008 and 2009 and an overall demand decline during the period of investigation, the Commission found

14

that subject imports from China "had a material impact on the domestic industry"
during this period.  JA 1595.

Responding to Appellants' claims that between January 2009 and June 2011,
demand "substantially stabilized," shipments increased, the domestic industry's
prices were flat, and the domestic industry's operating margins improved, the
Commission also addressed the relative effects of subject imports and demand
during the January 2009 to June 2011 period.  After noting that some of the
domestic industry's performance factors appeared to improve somewhat during
this period, the Commission explained that these improvements nonetheless
generally lagged the overall improvement in market demand during a time when
subject imports continued to increase their market share by significantly
underselling the domestic like product.  Specifically, although apparent U.S.
consumption increased 7.8 percent between 2009 and 2010, the domestic
industry's U.S. shipments of MLWF only increased [[    ]] percent, its net sales
quantity rose only [[    ]] percent, and its net sales value actually declined another
[[    ]] percent.  JA 1596 & n.204.  The domestic industry lost [[    ]] percentage
points of market share from 2009 to 2010, while subject imports' U.S. shipment
volumes increased at a faster pace than demand, growing by 13.2 percent.[11]  JA

---

[11] The domestic industry lost another [[    ]] percentage points of market share
between interim 2010 and interim 2011, whereas subject imports increased at a

1596 n.204.  Because the domestic industry disproportionately bore the burden of

economic downturns during these periods and did not share proportionately in

market improvements, consistently [[              ]], and experienced steep

employment and wage declines, the Commission concluded that general market

demand conditions did not adequately explain the changes in the domestic

industry's indicators at the end of the period of investigation.  JA 1596.

　　　As the Commission further explained, the apparent improvement in the

domestic industry's negative performance at the end of the POI was less due to

enhanced sales related to a general economic recovery than it was to the severe

measures the domestic industry undertook to remain competitive in the face of

significant low-priced subject imports.[12]  JA 1596-97.  Thus, the Commission

found the decline in the domestic industry's financial losses at the end of the

period of investigation did not sever any causal connection between the domestic

industry's condition and subject imports.  JA 1597.  For the aforementioned

reasons, and in compliance with the CIT's remand order, the Commission

---

faster pace than demand, growing by 7.6 percent during this period.  JA 1596
n.204.

[12] Specifically, the record established that the domestic industry's apparent financial
improvements were driven in large part by [[              ]] partial
abandonment of domestic production by [[
        ]] in favor of increased volumes of low-cost subject imports, asset
impairments, and significant SG&A cost cutting while operating at low capacity.
Additionally, the financial data reflected the benefit but not the cost of [[
        ]].  JA 1596-97 n.207.

concluded that, "but for the unfairly traded subject MLWF imports from China in the U.S. market during the POI, the domestic industry would have been materially better off both during the housing market collapse and during the developing recovery that followed." JA 1597. Accordingly, on September 30, 2013, the Commission issued its Remand Views in which it determined that the domestic industry was materially injured by reason of subject imports from China.

### IV.    The Second Decision of the Court of International Trade.

On July 16, 2014, the CIT held that the Commission's Remand Views complied with the Remand Order and sustained the Commission's affirmative material injury determination. With respect to causation, the CIT concluded that the Commission had "properly framed the legal basis upon which to determine whether subject imports are the cause-in-fact of material injury, to wit, 'notwithstanding any injury from other factors,'" which the CIT characterized as "an obvious expression of a 'but for' cause-in-fact inquiry." *Swiff-Train II*, 999 F. Supp.2d at 1344 (favorably citing *Mittal*, 542 F.3d at 879 n.2 (summarizing the remarks of two former Commissioners)).

The CIT then recognized that there may be more than one way for the Commission to meet the legal standard, but "so long as the method chosen reasonably addresses the 'but for' question of causation relevant to the material injury issue (*i.e.*, 'by reason of'), the Commission's discretion over the method

employed will be sustained." *Swiff-Train II*, 999 F. Supp.2d at 1344-45.  That is, the Commission "need not state for the record the precise contours of the hypothetical counterfactual 'but for' state, so long as its ultimate conclusions, on causation 'by reason of' subject imports from the evidence of record, are discernible and reasonable." *Id*. at 1352.[13]  The CIT continued:

> …following a rather thorough analysis of the issue to identify
> and isolate the effects of subject imports, the Commission on
> remand concluded that 'but for the unfairly traded subject
> MLWF imports {from the PRC} in the U.S. market during the
> POI, the domestic industry would have been materially better
> off during the housing market collapse and during the
> recovery that followed.'  The Commission therefore
> reaffirmed its conclusion that subject imports of MLWF from
> the PRC had a significant adverse impact on the domestic
> industry during the POI.  The Commission found that the
> domestic industry disproportionately suffered not only during
> the market collapse but also in the period that followed as the
> direct result of unfairly priced subject imports.  *Id*.

Having deemed the methodology used by the Commission in this case to be legally valid, the CIT then proceeded to examine "whether analysis of the substantiality of the evidence of record supports the conclusion drawn." *Swiff-Train II*, 999 F. Supp.2d at 1345.  The CIT approved the Commission's analysis,

---

[13] The CIT stated that the "hypothetical the plaintiffs propose as 'but for' causation analysis is not dispositive on this use – of what the domestic MLWF industry *would have* experienced in the absence of imports of subject merchandise." *Swiff-Train II*, 999 F. Supp.2d at 1351.  The CIT noted that it had previously disagreed "that the statute in conjunction with our appellate precedent requires … {}strict application of the 'but-for' causation standard to a particular factual scenario" and that the CIT would "function here does not involve reweighing the facts." *Id.*

noting, *inter alia*, "{i}mportantly, the Commission found that the domestic industry's loss of market share to unfairly traded subject imports that significantly undersold the domestic like product throughout the POI was not a function of any declines in demand." *Id*. at 1346.

The CIT also agreed that the Commission properly rejected Appellants' argument that the Commission should have ignored data from the first year of the POI, because 2008 marked the collapse of the housing market and demand for MLWF. *Id.* at 1351 ("The court cannot find that the decision not to emphasize a shorter POI period was an abuse of its discretion."). In any event, the CIT also noted that the Commission's Remand Views analyzed data for the entire POI as well as the "relative effects of demand and subject imports during 2008 and during January 2009 to June 2011, the periods the {Appellants'} brief emphasized. By doing so, the Commission appears to have adequately refuted the {Appellants'} claims that data for these periods established that there was no causal link between subject imports and the material injury to the domestic industry." *Id*. For the foregoing reasons, the CIT sustained the Commission's Remand Views.

## SUMMARY OF ARGUMENT

In the underlying investigation, the Commission complied with the language of the antidumping and countervailing duty statutes when it found, based on the record evidence, that the domestic industry producing MLWF was materially

injured by reason of subject imports from China. In reaching this determination, the Commission provided a detailed analysis of the statutory factors that it is required to consider in analyzing the volume, price effects and impact of subject imports. 19 U.S.C. § 1677(7). Specifically, the Commission found that the record supported its finding that the significant and increasing volume of subject imports that were underselling the domestic like product at significant margins had a significant adverse impact on the domestic industry's condition. Moreover, in accordance with the governing statute as well as guidance from this Court, the Commission examined factors other than subject imports to ensure that it was not attributing injury from these sources to the subject imports. Accordingly, the Commission considered the role of demand, substitute flooring products, and nonsubject imports, and explained how it did not attribute injury from them to subject imports. The Commission therefore satisfied its legal obligations to ensure that it was not inflating an otherwise incidental, tangential, or trivial cause of injury into one that satisfies the statutory material injury threshold.

Appellants argue that the Commission erred because it did not conduct a counterfactual analysis in order to determine whether subject imports were a "but for" cause of material injury to the domestic industry. In Appellants' misplaced views, the Commission's "refusal to apply an analysis that constructs analytically a counterfactual state of the United States industry absent competition from MLWF

imports from China is contrary to clear Congressional intent." App. Brief at 17. Appellants' argument, however, is not focused on the pertinent law governing trade remedies investigations. Instead, Appellants focus on inapplicable law governing a wholly different subject matter. Specifically, Appellants rely on commentary and court decisions in other unrelated legal contexts, *i.e.*, tort law and criminal law, with clearly different legal standards, and well as court decisions interpreting language in other statutes. Accordingly, Appellants' arguments largely ignore the antidumping and countervailing duty laws, the legislative history of those laws, and this Court's guidance regarding the causation standard applicable under these laws.

Moreover, when Appellants do turn to the pertinent statute, their arguments miss the mark. Indeed, this Court has made clear that, because the statute does not define the phrase "by reason of," the question of whether the record before the Commission demonstrates material injury by reason of subject imports is a matter within the Commission's expertise and is reviewable under the substantial evidence standard. The Commission's detailed analysis of the record evidence in these investigations satisfied that standard. The Commission recited its legal obligations in the area of causation, as reflected in its Remand Views. In order to satisfy the legal standard, the Commission conducted a detailed analysis based on the record evidence to ensure that the harm to the domestic industry occurred by

21

reason of the subject imports, not by reason of a minimal or tangential contribution to material harm caused by subject imports. This analysis, which was supported by substantial evidence on the record, demonstrates that the Commission reasonably analyzed the facts in this case, and applied the proper legal standard previously set out by this Court.

By seeking to impose their own preferred counterfactual methodology on the Commission as the only means to satisfy causation under the statute, Appellants are improperly asking this Court to mandate a specific and narrow methodology on the Commission to satisfy the legal standard. This Court has repeatedly rejected that approach, recognizing that the Commission is entitled to employ any type of reasonable methodology in conducting its injury analysis. Moreover, Appellants' proposed approach is out of place in the context of this case, where the administrative record contains empirical data showing the necessary causal link. It would make little sense to impose a counterfactual methodology on the Commission when the actual facts and the actual data on the record provide the Commission with the requisite information to conduct a reasonable causation analysis.

# ARGUMENT

## I.     Standard of Review.

The Federal Circuit duplicates the standard of review of the court below by evaluating whether the Commission's determinations are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); [14] *ALTX, Inc. v. United States*, 370 F. 3d 1108, 1116 (Fed. Cir. 2004).   The Court, however, gives "great weight to 'the informed opinion of the Court of International Trade.'"  *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (quoting *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 983 (Fed. Cir. 1994)). Under the substantial evidence standard, this Court will affirm the Commission's determinations if they are reasonable and supported by the record as a whole, even if some evidence detracts from the Commission's conclusion.  *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-64 (Fed. Cir. 1984).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial

---

[14]  By statute, Commission decisions are presumed to be correct unless the party challenging the decision satisfies the burden of proving otherwise.  28 U.S.C. § 2639(a)(1).

evidence. *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.

Cir. 1984), quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 619-20

(1966).

Parties challenging the Commission's determinations under the substantial

evidence standard have "chosen a course with a high barrier to reversal." *Nippon*,

458 F.3d at 1352 (quoting *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d

1056, 1060 (Fed. Cir. 2001)). It is neither "surprising nor persuasive" that

appellants may be able to point to "evidence of record which detracts from the

evidence which supports the Commission's decision" or can "hypothesize a

reasonable basis for a contrary determination." *Matsushita*, 750 F.2d at 936. The

substantial evidence test does not require an "absence of evidence detracting from

the agency's conclusion, nor is there an absence of substantial evidence simply

because the reviewing court would have reached a different conclusion based on

the same record." *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir.

2007).

The Commission is expected to address the major relevant arguments of the

parties and to discuss the "issues material to {its} determination" so that the "path

of the agency may reasonably be discerned." Uruguay Round Agreements Act

Statement of Administrative Action ("SAA") , H.R. Rep. 103-316, vol. 1, at 892

(1994);[15] 19 U.S.C. § 1677f(i)(3)(B); *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1358 (Fed. Cir. 2005). At the same time, it is "the Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process." *Nippon*, 458 F.3d at 1350, quoting *U.S. Steel Grp.*, 96 F.3d at 1357. Thus, "{s}o long as there is adequate basis in support of the Commission's choice of evidentiary weight, … this {C}ourt, reviewing under the substantial evidence standard, must defer to the Commission." *Nippon*, 458 F.3d at 1359.

In reviewing the Commission's findings "to ensure that they are without legal error and supported by substantial evidence," this Court reviews "those decisions for reasonableness." *ALTX,* 370 F.3d at 1124; *U.S. Steel Grp.*, 96 F.3d at 1357.

## II.    As the CIT Correctly Concluded, the Commission Reasonably Found the Domestic Industry Materially Injured by Reason of Subject Imports.

An affirmative material injury determination "requires both (1) present material injury and (2) a finding that the material injury is 'by reason of' the subject imports." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 719 (Fed. Cir. 1997). In this case, Appellants argue that the Commission could not show that

---

[15] Congress approved the SAA "as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and {the URAA} in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

25

any injury to the domestic industry is by reason of subject imports as opposed to other factors because it did not conduct a counterfactual analysis of what the domestic industry's condition would have been in the prevailing conditions absent subject imports. Appellants' Brief at 26-29. Appellants claim that the failure of the Commission to conduct a counterfactual analysis "violates the 'but-for' test imposed under the statutes and established by this Court and the Supreme Court" and the "Commission's causation analysis, therefore, was not in accordance with the antidumping and countervailing duty statutes at issue in this case, and thus, the Remand Views and Remand Order should be reversed as contrary to law." Appellants' Brief at 28-29. As discussed below, despite Appellants' claims, the Commission complied fully with the relevant and actually applicable statutes and legal authority. Specifically, the Commission properly considered the statutory factors of the volume of subject imports, their price effects, and their impact on the domestic industry, and found that substantial evidence on the record established a causal link between subject imports and the material injury to the domestic industry. The Commission also fully considered the role of other factors in the market that may have also been injuring the domestic industry, and reasonably found that these other factors did not break the causal link between subject imports and the material injury to the domestic industry.

The CIT agreed. After reviewing the methodological and factual sufficiency of the Commission's analysis, the CIT stated that it could not conclude that the Remand Views are unsupported by substantial evidence on the record or not in accordance with law, and therefore, affirmed the Commission's Remand Views. *Swiff-Train II*, 999 F. Supp.2d at 1350.

### A. The Commission's Analysis of the Effects of the Subject Imports Comported with its Legal Obligations.

### 1. Statutory Requirements.

### a. General Statutory Requirements.

When analyzing whether an industry is materially injured "by reason of" subject imports, the Commission considers the volume of subject imports, their price effects, and their impact on the domestic industry. 19 U.S.C. §§ 1677(7)(B)(i), 1677(7)(C)(i)-(iii).[16] No single factor is dispositive, and the Commission considers all relevant factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii). The Commission interprets the provisions of section 1677(7)(B) and (C) as establishing the requisite considerations for its statutory determinations of whether an industry in the United States is materially injured or threatened with material injury by reason of subject imports. Therefore, in

---

[16] The statute defines "material injury" as "harm which is not inconsequential, immaterial, or unimportant," 19 U.S.C. § 1677(7)(A).

considering whether a domestic industry is materially injured by reason of subject

imports, the Commission must consider the volume of the subject imports, their

price effects, and their impact on the domestic industry.[17]

Beyond these factors, the statute, however, does not define the phrase "by

reason of." *Mittal*, 542 F.3d at 872-73, 877-79; *Gerald Metals*, 132 F.3d at 722;

*Angus Chem. Co. v. United States*, 140 F.3d 1478, 1483-84 (Fed. Cir. 1998); *U.S.*

*Steel*, 96 F.3d at 1362.  This Court has on several occasions, including in the cases

cited above, reviewed the Commission's application of this statutory language.

And the Commission has adhered here to the guidance provided by this Court as to

the requirements for a proper causation analysis.  That is, the Commission here

thoroughly analyzed the effects of the subject imports to examine whether "harm

{to the domestic industry} occurred 'by reason of' the LTFV imports, not by

reason of a minimal or tangential contribution to material harm caused by LTFV

---

[17] The Commission's construction of the statutory requirements are buttressed by
the legislative history of the Trade Agreements Act of 1979, which repealed the
Antidumping Act of 1921 and established the current provisions cited in the text
above.  *See* S. Rep. No. 96-249 at 86-87 (1979); *see also* H.R. Rep. No. 96-317, at
46-47.  Both the reports of the Committee on Finance and the Committee on Ways
and Means stated that the Commission's determinations predating the statutory
amendments realized by the Trade Agreements Act were, on the whole, consistent
with the requirements of the 1979 legislation.  Thus, the House Report explained:

> The bill contains the same causation element as present law, i.e.
> material injury must be "by reason of" the subsidized or less than fair
> value imports.  In determining whether such injury is "by reason of"
> such imports, the ITC looks at the effects of such imports on the
> domestic industry.

goods." *Mittal*, 542 F.3d at 873, (citing *Gerald Metals*, 132 F.3d at 722), *Nippon*, 458 F.3d at 1350 (citing *U.S. Steel*, 96 F.3d at 1357); and S. Rep. 96-249 at 74-75.

### b. The Commission Adhered to the Proper "By Reason of" Standard.

In the Commission's view, this case is simply about whether the Commission properly applied the facts in the record of this investigation to the well-established framework for assessing causation.  Nonetheless, even if Appellants are correct that this case is about the proper legal standard, the Commission submits that it absolutely adhered to the statutory requirements, consistent with this Court's decisions discussing the statutory causation standard.

In construing the "by reason of" language consistent with this Court's teachings, the Commission has looked to the statute, along with the SAA and the legislative history.[18]  Pursuant to this authority, the Commission identifies a causal link, if any, between subject imports and material injury to the domestic industry by examining the facts of record that relate to the significance of the volume and

---

[18] This Court accords substantial weight to the Commission's reasonable interpretations of the antidumping and countervailing duty statutes it administers. Unless the Commission's interpretation of the antidumping and countervailing duty statutes contravenes clearly discernible legislative intent, this Court will affirm the Commission's interpretation of its governing statute, even if the agency's interpretation is not the only reasonable statutory interpretation or one the Court would have adopted.  *See Comm. for Fairly Traded Venezuelan Cement v. United States*, 372 F.3d 1284, 1289-91 (Fed. Cir. 2004); *Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1101-05 (Fed. Cir. 1990), reh'g denied (May 29, 1990); *Am. Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986).

price effects of the subject imports and any impact of those imports on the

condition of the domestic industry.  Section 1677(7)(C) provides additional

direction to the Commission as to what it must consider in evaluating the required

statutory factors relating to volume, price and impact.  In examining whether the

volume of subject imports is significant, the Commission considers their absolute

quantity, their shares of the U.S. market relative to the domestic product and other

imports, and any increases in absolute quantity and market share over the period

investigated.  19 U.S.C. § 1677(C)(i).  In examining price, the Commission

considers whether the subject imports, as well as other imports, undersold the

domestic product, and whether U.S. prices were depressed or suppressed to a

significant degree.  19 U.S.C. § 1677(C)(ii).  In examining impact, the

Commission considers, in the context of the business cycle and conditions of

competition, all the relevant factors that bear on the state of the U.S. industry,

including, but not limited to, output, sales, inventories, capacity utilization, market

share, employment, wages, productivity, profits, cash flow, return on investment,

ability to raise capital, and research and development.  19 U.S.C. § 1677(C)(iii).  It

examines the state of the U.S. industry in relation to available data in the record

concerning the volumes and prices of the subject imports to determine whether the

domestic industry's condition during the period examined had been affected

adversely and significantly by the subject imports.

The Commission's analysis of causation is thus integral to its consideration of the statutorily-mandated factors of volume, price, and impact. The Commission draws reasonable inferences from the data before it, including, but not limited to, trends and relationships. The courts have agreed that mathematical precision is not required,[19] but that substantial evidence must support the Commission's ultimate determination.[20] The Commission thus interprets the "by reason of" language in a manner that implements the statutory requirement of finding a causal, not merely a temporal, link between the subject imports and the material injury to the domestic industry.

There are several situations in which this causation standard would not be satisfied. The Commission may not arrive at affirmative material injury determinations in cases where subject imports are a minimal or tangential cause of material injury to the domestic industry. Alternately, if the Commission finds that there are other causes that fully explain the injury suffered by the domestic industry, or that these other causes render the impact of the subject imports minimal or tangential, the causation standard is not satisfied.[21] In order to satisfy

---

[19] *See Altx,* 370 F.3d at 1121-22.

[20] *Nippon*, 458 F.3d at 1350, 1358-59 (explaining the meaning of the substantial evidence standard of review, noting that the issue is merely whether the Commission's determination was reasonable, not whether the court would itself have made the same decision).

[21] *See, e.g., Mittal*, 542 F.3d at 873; *Gerald Metals*, 132 F.3d at 722; *Nippon Steel Corp.*, v. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed. Cir. 2003).

the causation standard, the legislative history explains that the Commission must examine relevant factors other than subject imports to ensure that it is not attributing injury from those factors to subject imports, thereby inflating an otherwise tangential cause of injury by subject imports into one that satisfies the statutory material injury threshold.  SAA at 851-52 (1994); S. Rep. No. 96-249 at 75 (1979); H.R. Rep. No. 96-317 at 47 (1979); *accord Mittal*, 542 F.3d at 877.

This Court has recognized the language in the SAA stating that the Commission need not isolate the injury caused by other factors from injury caused by subject imports, weigh injury from other factors against injury from subject imports, or demonstrate that subject imports are the "principal" cause of injury. *See Nippon*, 345 F.3d at 1381 ("the 'dumping' need not be the sole or principal cause of injury."); SAA at 851 (the Commission "need not isolate the injury caused by other factors from injury caused by unfair imports"); *Taiwan Semiconductor Indus. Ass'n. v. Int'l Trade Comm'n*, 266 F.3d 1339, 1345 (Fed. Cir. 2001) (the Commission "must examine other factors to ensure that it is not attributing injury from other sources to the subject imports") (emphasis and citation omitted); *Salmon*, 26 CIT at 43, 180 F. Supp. 2d at 1375 (the Commission need not make "bright-line distinctions" between the effects of subject imports and other causes or "isolate the effects of subject imports from other factors contributing to injury"); *Gerald Metals*, 132 F.3d at 722 (an importer cannot escape "countervailing duties

32

by finding some tangential or minor cause unrelated to the {unfairly traded} goods that contributed to the harmful effects on domestic market prices."). [22]  Indeed, the statutory scheme contemplates that an industry may be facing difficulties from a variety of sources, but that injury caused by other factors does not compel a negative determination if the subject imports are more than a minimal or tangential cause of injury.  SAA at 851-52, 885; *Mittal*, 542 F.3d at 872-73, 877.  Had Congress intended a stricter causation standard in the antidumping/countervailing duty laws, it would have included such a requirement, as it did in the "substantial cause of serious injury" standard for safeguard investigations, which defines "substantial cause" as "a cause which is important and not less than any other cause."  19 U.S.C. § 2252(b)(1)(B).

In its discussion of causation in present injury investigations, Congress recognized that the Commission's obligations to consider "any known factors, other than the dumped {or subsidized} imports which at the same time are injuring the domestic industry" were already reflected in the existing statute and legislative history.  SAA at 851.  Congress further explained that the "Commission need not isolate the injury caused by other factors from injury caused by unfair imports.  Rather, the Commission must examine other factors to ensure that it is not

---

[22] "Any such requirement has the undesirable result of making relief more difficult to obtain for those industries facing difficulties from a variety of sources, precisely those industries that are most vulnerable to subsidized or dumped imports."  H.R. Rep. No. 317, 96th Cong., 1st Sess. at 47 (1979).

attributing injury from other sources to subject imports." SAA at 851-52 (internal citations omitted). Consistent with this language, this Court stated that it expects the Commission if making an affirmative present material injury determination to show that subject imports are more than a minimal or tangential cause of injury and to explain why there is a sufficient causal, not merely temporal, nexus between subject imports and material injury – that is "the injury to the domestic industry can reasonably be attributed to the subject imports" such that the agency has ensured "that it is not attributing injury from other sources to the subject imports." *Mittal*, 542 F.3d at 876-77. This language represents the Congressionally-approved causation standard that the Commission must adhere to in a present injury investigation, and it is this standard that the Commission satisfied in its thorough and detailed analysis of the record evidence in this case.

### 2. The Commission May Use Any Reasonable Methodology to Assess Causation.

This Court has recognized that, with the antidumping and countervailing duty laws, "Congress has crafted an intricate statute, and committed {the} enforcement {of that statute} to {Commerce} and the International Trade Commission." *U.S. Steel Grp.*, 96 F.3d at 1362. The Court has also stated that, where the statute does not compel a methodology for the Commission to employ, "we are not persuaded that we should create one, even were we so empowered." *Id.*; *see also Nucor Corp. v. United States*, 601 F.3d 1291, 1295 (Fed. Cir. 2010).

Within the statutory guidelines, implementation of any particular analysis (such as causation) in antidumping and countervailing duty cases is not reliant on precise applications of statistical analysis, given the complexity of the analyses involved.[23]

Indeed, as this Court has explained, because of the agency's institutional expertise in resolving injury issues, Congress delegated the task of determining causation to the Commission. *Mittal*, 542 F.3d at 873; *Nippon*, 458 F.3d at 1350 (citing *U.S. Steel Grp.*, 96 F.3d at 1357); S. Rep. 96-249 at 75 ("The determination of the ITC with respect to causation is … complex and difficult, and is a matter for the judgment of the ITC."). Moreover, in analyzing whether material injury is by reason of subject imports, this Court has recognized that "the Commission is not required to follow a single methodology for making that determination." *Mittal,* 542 F.3d at 873 (Commission has "broad discretion with respect to its choice of methodology"); *Mittal,* 542 F.3d at 876-78 (assessment of whether material injury to the domestic industry is "by reason of" subject imports "does not require the Commission to address the causation issue in any particular way" as long as "the injury to the domestic industry can reasonably be attributed to the subject imports"

---

[23] *See Zenith Radio Corp. v. United States,* 437 U.S. 443,458-59 (1978) (upholding Commerce's construction of countervailing duty statute as reasonable and rejecting arguments that it was premised on false economic assumptions); *see also Altx,* 370 F.3d at 1121-22 (affirming Commission's discretion to refuse to abide by a theoretical economic model: "it alone is not a substitute for considering the factors specified in the statute and the data on the record.").

and the Commission "ensure{s} that it is not attributing injury from other sources to the subject imports). S. Rep. No. 96-249 at 75. As this Court stated in *U.S. Steel*, 96 F.3d at 1362:

> The statute on its face compels no such uniform methodology, and we are not persuaded that we should create one, even were we so empowered. . . .
>
> The invitation to employ such diversity in methodologies is inherent in the statutes themselves, given the variety of the considerations to be undertaken and the lack of any congressionally mandated procedure or methodology for assessment of the statutory tests.
>
> This court has no independent authority to tell the Commission how to do its job. We can only direct the Commission to follow the dictates of its statutory mandate. So long as the Commission's analysis does not violate any statute and is not otherwise arbitrary and capricious, the Commission may perform its duties in the way it believes most suitable.

Consistent with this reasoning, this Court has examined and affirmed various Commission methodologies and has disavowed "rigid adherence to a specific formula." *Nucor* 414 F.3d at 1336, 1341 ; *see also Mittal*, 542 F.3d at 879 (no "Procrustean formula for determining whether a domestic injury was 'by reason of' subject imports.").

36

### 3. The Commission Employed a Reasonable and Statutorily-Consistent Methodology Here.

### a. Appellants' Argument Largely Rests on Inapplicable Case Law.

Notwithstanding this Court's teachings regarding the precise statutory provision at issue in this case, Appellants here demand "a rigid adherence to a specific formula" by asserting that the only way the Commission could satisfy the "by reason of" language in the statute is by conducting a counterfactual "but for" analysis. To support their claim, Appellants cite various Supreme Court opinions and dissents that involved review of other agencies' actions under other statutory schemes. App. Brief at 22-29. Relying on cases concerning interpretations of wholly inapplicable statutes, Appellants conclude that the Commission's refusal to apply an analysis that constructs a counterfactual state "is contrary to clear Congressional intent." App. Brief at 17.

When Appellants do turn to the statute at issue here, they cannot support their claims, as evidenced by Appellants' efforts to insist on one hand that the statute requires one specific type of causation methodology, while on the other hand acknowledging that the phrase "by reason of" is not defined in the statute. Appellants ignore the contextual meaning of the causation language in the antidumping and countervailing duty laws. They overlook the relevant SAA guidance and legislative history, which fully support the Commission's reasonable

37

interpretation of the language in the statute it administers.  Consequently, Appellants have failed to meet their burden of establishing that the Commission's analysis of causation contravenes clearly discernible legislative intent and is not based on a permissible statutory construction.

Appellants argument that the Commission was required to perform a counterfactual "but for" test to satisfy its statutory causation requirements is thus based on off-point court decisions.  Rather than addressing the pertinent trade statute, Appellants cite various Supreme Court cases in which "because of" language has been interpreted to require a 'but-for' test."  App. Brief at 22-24. Even in the context of these decisions, Appellants overlook important judicial admonitions about scrutinizing statutory language in the context of the particular statute under review.  Thus, in the cases cited by Appellants, the Supreme Court's construction of "because of" language has turned on a contextual reading of each specific statutory provision.  For example, in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1998) (since superseded by statute), a plurality of the Justices agreed that a "but-for" analysis was not required to prove status-based discrimination under Title VII of the Civil Rights Act of 1964.[24]  In subsequently determining (by a split

---

[24] The six Justices did agree that a plaintiff could prevail on a claim of status-based discrimination if he or she could show that one of the prohibited traits was a "motivating" or "substantial" factor in the employer's decision.  *Price Waterhouse v. Hopkins*, 490 U.S. at 258 (plurality opinion); *id.* at 259 (White, J., concurring in judgment); *id.* at 276 (O'Connor, J., concurring in judgment).

vote) that a "but-for" test was required due to the "because of" language in the Age Discrimination in Employment Act of 1967, the Court majority was careful to restrict its analysis to the specific statute before it. *Gross v. FBL Financial Services, Inc.,* 557 U.S. 167, 176-179 (2009). Most recently, in *University of Texas Southwestern Medical Center v. Nassar*, 133 S.Ct. 2517, 2525 (2013), another divided Supreme Court reviewing the retaliation provision in the Title VII Civil Rights statute determined that a "but-for" test was required to prove causation. Acknowledging that the Court was treating the same language, "because of," as requiring different causative tests within the same statute, the Court reasoned that "text cannot be removed from context," and explained that the "text, structure, and history of Title VII" supported its determination. *Id.* at 2531, 2534. Accordingly, the Supreme Court has made clear that context, structure, and the history of the statutory scheme at issue are vital considerations in interpreting statutory language.

### b. To the Extent Appellants Discuss the Applicable Statute and Case Law, they Misconstrue the Statute and Court Decisions.

When Appellants finally address the relevant trade provisions of the antidumping and countervailing duty laws, they selectively quote only a portion of *Mittal* to support their claim that the Commission was required to conduct a counterfactual "but for" causation analysis. Appellants' Brief at 26. At its core,

Appellants' arguments amount to nothing more than an attack on the

Commission's discretion to employ a reasonable methodology to analyze the

record evidence to assess whether material injury is "by reason" of subject imports.

As this Court has made clear in *Mittal*, however, the Commission is not required to

use any specific analysis to determine causation as long as it considers the statutory

factors of volume, price, and impact, and also ensures that it is not attributing

injury from other factors to subject imports:

> To say that an affirmative determination must be based on
> evidence that the injury to the domestic industry is "by reason
> of" subject imports does not require the Commission to
> address the causation issue in any particular way, or to apply a
> presumption that non-subject producers would have replaced
> the subject imports if the subject imports had been removed
> from the market.  The Commission is simply required to give
> full consideration to the causation issue and to provide a
> meaningful explanation of its conclusions.  *Mittal*, 542 F.3d at
> 878.

Of particular note, in *Mittal*, this Court favorably cited the approach used in

that case by two Commissioners, which has since been adopted and used in the

instant case by the Commission majority.  Compare *Mittal*, 542 F.3d at 879 at n.2

("interpreting *Bratsk* in that manner, *i.e.*, as reminder that the Commission, before

it makes an affirmative determination must satisfy itself that it has not attributed

material injury to factors other than subject imports, is consistent with the

Commission's obligation to analyze the effects of the unfairly traded imports and

other relevant factors in a way that enables the Commission to conclude that it has

40

not attributed the effects of other factors to the subject imports.") (internal citations omitted) with Remand Views, JA 1583 n.142 & 1589-1600.

The Commission's analysis in these investigations was fully consistent with this Court's guidance regarding the causation standard of the statute the Commission administers. *Mittal*, 542 F.3d at 873-79; *Gerald Metals*, 132 F.3d at 722. As this Court prescribed in *Mittal*, 542 F.3d at 873-79, the Commission "full{y} consider{ed}" other factors that might be injuring the domestic industry and provided a "meaningful explanation," with substantial evidentiary support of its conclusion that these conditions did not break the causal link between subject imports and the material injury to the domestic industry.

> ### c. Appellants' Efforts to Impose Their Own Preferred Counterfactual Methodology On the Commission is Unavailing.

Appellants also assert that in order to satisfy the causative requirements under the antidumping and countervailing duty law, the Commission is required to perform a counterfactual analysis by comparing the actual state of the domestic industry during the period of investigation with what the state would have been absent the subject imports. App. Brief at 26-29. Appellants are once again mistaken. At the outset, Appellants provide no support for their argument that a counterfactual analysis is required under the statute. In fact, where Congress has required a counterfactual analysis by the Commission to satisfy a statutory

41

threshold under the antidumping and countervailing duty law, it has explicitly told the Commission to perform that analysis. Specifically, in the context of five-year reviews of orders, where the Commission is determining the likelihood of continuation or recurrence of injury, the SAA states:

> The likelihood of continuation or recurrence of material injury standard is not the same as the standards for material injury and threat of material injury, although it contains some of the same elements. Under the material injury standard, the Commission determines whether there is current material injury by reason of {subject merchandise}. Under the threat of material injury standard, the Commission decides whether injury is imminent given, the status quo. *By comparison*, under the likelihood standard, the Commission will engage in a counter-factual analysis: it must decide the likely impact in the reasonably foreseeable future of an important change in the status quo – the revocation or termination of a proceeding and the elimination of its restraining effects on volumes and prices of imports. (Emphasis added).

SAA at 883-84.

At the time of the passage of the SAA, the Commission had conducted and issued determinations in a long line of original investigations. Had the Commission not been effectuating clear Congressional intent in those determinations, Congress had the platform to address and rectify that issue in the SAA. Congress did no such thing. In fact, as the quoted language from the SAA makes clear, Congress contrasted the required counterfactual analysis in five-year

reviews, with the causation analysis in original investigations.[25]  Accordingly,

Appellants' claim that clear Congressional intent requires the Commission to

conduct an explicit counterfactual analysis as the only means of satisfying the

requisite causation requirements for original determinations lacks support.

Nor is there merit to Appellants' efforts to impose the application of the

CADIC and COMPAS economic models once used by the Commission to help

reach a counterfactual "but for" determination.  Appellants' Brief at 29-34.

COMPAS modeling was one analytic tool that appeared in Commission Staff

Reports during the 1990s, but, contrary to Appellant's suggestion, was never used

by a majority of the Commission as its sole form of analysis in a Commission

opinion.  Moreover, there is no basis for Appellants' unfounded claim (Br. at 31)

that the Commission stopped using the COMPAS modeling (almost 15 years ago)

because use of that model threatened the Commission's ability to make

"unfettered" injury determinations.  In reality, as the Commission explained

shortly after it stopped providing the COMPAS model in its reports, the

Commission prefers to rely on the actual empirical data in the record -- data which

the Commission virtually always found, and continues to find, to be more useful

---

[25] In five-year reviews, the statute requires the Commission to consider the likely volume, the likely price effects, and the likely impact of imports on the domestic industry if the existing antidumping duty or countervailing duty orders were revoked.  19 U.S.C. § 1675a.  Therefore, unlike the statutory language for original investigations, the statutory language for five-year reviews is premised on a counterfactual assumption, *i.e.,* the revocation of an existing order.

than conclusions based on a theoretical economic model.[26]  In affirming the

Commission's determination setting out the reasoning for the movement away

from COMPAS modeling, this Court recognized, and even Appellants

acknowledge (Br. at 32), that the Commission was not required to employ

COMPAS modeling to make its decision.  *See Altx,* 370 F.3d at 1121 (Fed. Cir.

2004) (stating that "it is within the Commission's discretion to refuse to abide by a

theoretical economic model that proves inconsistent with empirical data.").  Rather

than engaging in a hypothetical exercise, as Appellants would have it, the statutory

scheme allows the Commission to use its resources and expertise to gather, review,

and analyze actual record data to support its findings.  Moreover, the

Commission's decisions are hardly "unfettered" given that these decisions are

reviewable under the substantial evidence standard.

Despite Appellants' contrary claims (Br. at 18-20) the Federal Circuit has

made clear that, because the statute does not define the phrase "by reason of," the

question of whether the injury to the domestic industry by subject imports satisfies

the material injury threshold falls within the Commission's discretion and is

reviewable under the substantial-evidence standard.

---

[26] *See e.g., Circular Seamless Stainless Steel Hollow Products from Japan,* Inv. No.
731–TA–859 (Remand), USITC Pub. 3475 (Dec. 2001) at 7 (stating that the
empirical data in the record was more useful than conclusions based on the results
of the COMPAS model).

## B. Substantial Evidence on the Record Supports the Commission's Determination.

### 1. The Court Should Affirm the Commission's Determination as Supported by Substantial Evidence.

Consistent with its statutory obligations, the Commission fully examined and analyzed the record evidence gathered in the course of the investigation, as detailed, *supra,* in the Statement of Facts. In explaining its determination, the Commission identified evidence in the record demonstrating that the domestic industry was materially injured by reason of subject imports notwithstanding any record evidence of other factors that might also be having adverse effects on the industry at the same time. This evidence plainly rises at least to the level of substantial record evidence supporting the Commission's findings.

In conducting its analysis, the Commission examined whether the record data showed a causal link between subject imports and material injury to the domestic industry. In performing this analysis, the Commission examined the facts in the record that relate to the significance of the volume and price effects of the subject imports and any impact of those imports on the condition of the domestic industry. Upon this examination, the Commission concluded that there was in fact a causal link between the subject imports and material injury to the domestic industry producing MLWF. As set out in its Remand Views, the Commission found that the volume of MLWF imported into the United States from subject

CONFIDENTIAL BUSINESS
INFORMATION DELETED

producers in China was significant, both in absolute terms and relative to

consumption and production in the United States, and that the increase in subject

import volume relative to domestic production and apparent consumption was also

significant. JA 1580-81.  The Commission also found that the significant and

growing volume of low-priced subject imports of MLWF from China competed

directly with the domestic like product, and that it undersold the domestic like

product at significant margins, causing domestic producers to lose revenue and

market share and leading to evidence of adverse effects on the domestic industry's

prices.  JA 1578-83.

As support for its finding that the domestic industry was materially injured

by subject imports, the Commission explained that almost all of the domestic

industry's performance indicators declined significantly from 2008 to 2009, and it

pointed out that even those factors that appeared to improve somewhat between

2009 and 2010 were lower in 2010 than in 2008.  JA 1583-84.  By underselling the

domestic like product at significant margins during the POI, subject imports

increased market share significantly from [[      ]] to [[      ]] percent, whereas the

domestic industry's market share progressively declined from [[      ]] percent in

2008 to [[      ]] percent in 2010, and [[      ]] percent in interim 2011.  JA 1581

n.133 & 1584 n.145.  Faced with declining U.S. shipments and lower net sales, the

domestic industry had to reduce its overall production capacity, produce less, and

operate at low capacity-utilization levels.  JA 1584.

The Commission also explained that the domestic industry's financial

condition was poor over the POI.  The domestic industry's net sales value fell,

which the Commission found was consistent with its findings of lost sales and

lower prices due to low-priced subject imports.  The domestic industry had annual

operating losses of [[                                     ]], and had an operating

income margin ranging from [[                                     ]] percent between

2008 and 2010.  Its return on investment was [[          ]], and its capital and

research and development expenditures also declined.  JA 1585 nn.152 & 153.  Its

employment levels dropped consistently during the POI.  JA  1585 n.154.

Pursuant to the statutory scheme, the Commission's consideration of the volume of

subject imports, their effect on prices of the domestic like product, and their impact

on the domestic industry, all within the context of the business cycle and relevant

conditions of competition, provided substantial evidence of a causal nexus between

subject imports and the material injury suffered by the domestic industry.  JA

1586.

In further compliance with the statutory scheme, the Commission continued

its analysis of the record evidence to ensure that it was not attributing injury from

other factors to subject imports.  The information relied on by the Commission in

addressing this question constitutes substantial evidence showing that the injury

caused by subject imports to the domestic industry was not rendered

"inconsequential, immaterial, or unimportant" by other known factors.

### 2. Appellants' Efforts to Undermine the Commission's Reasonable Factual Findings are Unavailing.

On appeal, Appellants re-raise a number of factual issues that were

thoroughly evaluated by the Commission during the investigation.  In each of these

instances, the Commission reasonably explained its findings and reasons for

rejecting Appellants' preferred weighing of the evidence.  The fact that Appellants

attempt again to offer an alternate explanation of the record evidence does not

undermine the Commission's own reasoned analysis.  *Matsushita Elec. Ind. Co.,*

*Ltd. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984).

### a. The Commission's Findings Regarding the Relationship between Demand and the Industry's Condition are Supported by Substantial Evidence.

During the investigation, Appellants asserted that the blame for any injury to

the domestic industry rested on the burst of the housing market bubble and

associated decline in demand for MLWF, and not on subject imports.  The

Commission examined this asserted other cause to ensure it was not attributing to

subject imports the alleged injurious effects of declining demand.  In this regard,

the Commission acknowledged that demand declined during the POI, particularly

between January 2008 and June 2011.  The Commission noted, however, that the

48

declines in many of the domestic industry's performance indicators during that same period generally exceeded the overall 9.2 percent demand decline.  JA 1593-94 & n.192. (noting, *e.g.*, that the domestic industry's U.S. shipments declined [[      ]] percent, its production declined [[      ]] percent, its net sales quantities declined [[      ]] percent, and its net sales values declined [[      ]] percent).  Also, as the Commission explained, subject imports increased their market share significantly during the POI, by underselling at significant margins, regardless of demand conditions.  Because the [[      ]] percent overall decline in subject imports' U.S. shipments was significantly less than the decline in demand, subject imports were able not only to maintain their share of the U.S. market but also to increase it significantly over the POI.  Given these undisputed facts, the Commission reasonably concluded that the domestic industry's loss of market share to unfairly traded subject imports from China that significantly undersold the domestic like product throughout the POI was not a function of declines in demand.  JA 1593-94.

In addition to examining the effects of demand over the full POI, the Commission also assessed the relative effects of demand and subject imports during 2008-2009 and during January 2009 to June 2011, the periods emphasized by Appellants.  The Commission more than adequately refuted Appellants' claims that data for these periods established that there was no causal link between subject imports and the material injury to the domestic industry.  For example, taking a

49

closer look at demand between 2008 and 2009, the Commission acknowledged that the domestic industry's already poor condition had worsened in 2009. The declines in the domestic industry's 2008 to 2009 performance indicators, however, generally exceeded the 15.7 percent decline in demand between 2008 and 2009. JA 1594-95 & n.197 (noting that the domestic industry's U.S. shipments declined [[   ]] percent, its production declined [[   ]] percent, its net sales quantities declined [[   ]] percent, and its net sales values declined [[   ]] percent during this period). Moreover, subject imports' [[   ]] percent overall decline in U.S. shipments was less than the decline in demand. As a result, during this period of declining demand, subject imports significantly increased their share of the U.S. market. JA 1595. Accordingly, the Commission reasonably concluded that the domestic industry's loss of market share to unfairly traded subject imports that significantly undersold the domestic like product between 2008 and 2009 could not be described as a function of demand. JA 1595. Thus, notwithstanding demand declines between 2008 and 2009 and an overall demand decline during the POI, the Commission reasonably found that subject imports from China "had a material impact on the domestic industry" during this period. JA 1595.

Appellants also claimed, and continue to claim, that between January 2009 and June 2011, demand "substantially stabilized," shipments increased, the domestic industry's prices were flat, and the domestic industry's operating margins

improved.  The Commission thoroughly addressed the relative effects of subject

imports and demand during the latter part of the POI.  First, the Commission noted

that, after 2009, apparent U.S. consumption improved somewhat, while some of

the domestic industry's performance factors also appeared to improve somewhat

during this period.  The Commission explained that these apparent industry

improvements nonetheless generally lagged the overall improvement in market

demand during a time when subject imports continued to increase their market

share by significantly underselling the domestic like product.  The evidence

indicated that the domestic industry disproportionately bore the burden of

economic downturns during the low-demand periods and did not share

proportionately in market improvements.  Instead, the domestic industry

consistently [[            ]], and experienced steep employment and wage declines

even while subject imports absorbed most of the increases in demand.  On this

record, the Commission reasonably concluded that general market demand

conditions did not adequately explain the changes in the domestic industry's

indicators at the end of the POI.  JA 1595-96.

As the Commission further explained, the apparent improvement in the

domestic industry's negative performance at the end of the POI was less due to

enhanced sales related to a general economic recovery than it was to the severe

measures the domestic industry undertook to remain competitive in the face of the

significant volume of low-priced subject imports.  JA 1596-97 & n.207.  Thus, the

Commission found the decline in the domestic industry's financial losses at the end

of the POI did not sever any causal connection between the domestic industry's

condition and subject imports.  JA 1597.  On this basis, the Commission concluded

that, "but for the unfairly traded subject MLWF imports from China in the U.S.

market during the POI, the domestic industry would have been materially better off

both during the housing market collapse and during the developing recovery that

followed." [27]  JA 1597.

### b.  The Commission's Findings Regarding Product Substitutability are Supported by Substantial Evidence.

Appellants also argued, and continue to argue (Br. at 54) that any increase in

subject imports displaced non-MLWF substitute flooring products (such as

laminate, vinyl, tile, carpet, bamboo, or cork flooring) instead of domestic MLWF.

Accordingly, the Commission analyzed this other factor to ensure it was not

attributing injury from it to subject imports.  Appellants' argument that the

increased volume of subject imports must have been displacing substitute flooring

products assumes that MLWF demand is "highly elastic."  This notion is based on

three assumptions:  (1) the undisputed point that subject MLWF imports from

China increased during the POI; (2) the assertion that demand remained

---

[27] In this regard, Appellants' contention that the Commission failed to conduct a "but for" analysis in this investigation is belied by the Remand Views.

"essentially stable" during the POI; and (3) the assertion that [[                    ]] while the supply of MLWF from China increased.  The record, however, did not support these assumptions, and the Commission thus reasonably rejected this argument.  The Commission did not find demand to be "essentially stable" or that [[                    ]], nor did the record otherwise show MLWF demand to be "highly elastic" such that any increased subject MLWF imports from China displaced substitute flooring products.  Instead, as discussed above, the Commission found that subject imports from China mostly took market share from the domestic MLWF industry and that MLWF had a stable share of the overall floorings market.

Appellants' theory assumes facts not shown by the record, including that demand was "stable" and that [[                    ]].  Contrary to Appellants' claims of stable demand, as the Commission correctly stated, demand declined overall, but subject imports from China increased their market share by [[    ]] percentage points and their market share in interim 2011 was [[    ]] percentage points higher than in interim 2010.[28]  JA 1581 n.133.  As the Commission noted, subject imports from China increased market share regardless of whether demand was increasing or decreasing.  JA 1581.  By the end of the POI, subject imports

---

[28] Appellants' claims of stable demand for purposes of this issue also contradict their claims of a drop in demand associated with the burst of the housing bubble for purposes of the preceding issue.

from China had almost completely recovered to 2008 levels, whereas MLWF produced domestically and by non-subject sources remained well below their respective 2008 levels. The record, therefore, supported the Commission's conclusion that subject imports from China increased market share mostly at the expense of the domestic industry.

The Commission also explained that subject imports from China maintained significant U.S. market share by selling products that were highly substitutable for the domestic like product, including products of the same and overlapping species in overlapping geographical markets and through similar channels of distribution. Competing directly against the domestic industry, the significant volume of subject imports from China increased significantly through widespread underselling of the domestic industry at significant margins. JA 1567-73. Thus, the record did not support the assumptions underlying Appellants' economic theory.

### c. The Commission's Findings Concerning the Non-attribution of Injury Caused by Non-Subject Imports are Supported by Substantial Evidence.

Finally, Appellants argued that, if subject imports were absent from the U.S. market, the domestic industry would not be better off, because U.S. importers were making arrangements to import "made to order" MLWF from nonsubject countries. Appellants overlook that the Commission exhaustively examined the

role of nonsubject imports in the market to ensure that it was not attributing injury

from them to subject imports.  Rather, Appellants rotely rely on factual scenarios –

unlike this one – involving a commodity product and significant, price-

competitive imports from nonsubject countries.  Under such circumstances, this

Court has cautioned that the Commission's task of ensuring that it does not

attribute to subject imports any injury from nonsubject imports is "particularly

difficult."  *Bratsk Aluminum Smelter v. United States*, 444 F.3d 1369, 1371 (Fed.

Cir. 2006), *reh'g en banc denied* (Jul. 24, 2006) (in those investigations of silicon

metal imports from Russia, characterizing silicon metal as a "commodity product"

and stating that "{m}aterial injury determinations are particularly difficult where

the imports sold at LTFV compete with identical imports not sold at LTFV.").

In contrast, the role of nonsubject imports in the instant case was not even

"particularly difficult," as this case did not involve a commodity, let alone a

significant price-competitive nonsubject imports of a commodity.  Indeed. during

the investigation, Appellants themselves argued that MLWF was a "made to order

product" that encompassed a variety of items in a range of species, plies,

interlocking technologies, texture, and other features, as part of their assertion that

the types of MLWF imported from China differed from those sold by the domestic

industry.  JA 335-360.  The Commission agreed with Appellants that MLWF

encompassed a variety of products in a range of species, plies, interlocking

technologies, and textures. The Commission, however, rejected Appellants' claims of attenuated competition because the record showed overlap among the products both industries supplied the U.S. market. JA 1525-31. Given the multiplicity of product permutations MLWF entailed, no Commissioner found MLWF to be a commodity. JA 1550.

In any event, the Commission provided a detailed explanation of the role of nonsubject imports in the U.S. market. Unlike the situation in *Gerald Metals*, where nonsubject pure magnesium primarily originated from a single source, the Commission explained in the instant case that there were a variety of nonsubject countries supplying the U.S. market with MLWF, including [[

]]. JA 1525, 50. Moreover, "unlike subject imports, nonsubject imports declined overall during the investigation period, both in absolute and relative terms." JA 1551 n.249 (noting that nonsubject imports market share by quantity was 16.1 percent in 2008, 15.1 percent in 2009, 15.6 percent in 2010, 15.0 percent in interim 2010, and 15.6 percent in the first six months of 2011). As the Commission also found, most of subject imports' increased market share "came at the expense of the domestic industry," and by the end of the POI, "the volume of subject imports had almost completely recovered to its 2008 levels, whereas domestically produced MLWF and nonsubject imports of MLWF remained substantially below their respective 2008 levels." JA 1532. Consequently, the

Commission properly distinguished the role of nonsubject and subject imports to ensure that it did not attribute to subject imports injury from nonsubject imports.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that this Court affirm the Commission's finding that a domestic industry was materially injured by reason of subject imports of MLWF from China.

Respectfully submitted,


/s/ Dominic L. Bianchi
Dominic L. Bianchi
General Counsel


/s/ Andrea C. Casson
Andrea C. Casson
Assistant General Counsel for
Litigation

/s/ David B. Fishberg
David B. Fishberg
Attorney-Advisor
U.S. International Trade
Commission 500 E Street, SW
Washington, DC 20436
January 28, 2015                        Tel: (202) 708-2614

## CERTIFICATE OF SERVICE

I, David B. Fishberg, hereby certify on this 28th day of January 2015

that I am electronically filing the attached **BRIEF OF DEFENDANT-**

**APPELLEE UNITED STATES** using the Court's CM/ECF system, which will

send notification to the following:

**On behalf of SWIFF-TRAIN CO., METROPOLITAN HARDWOOD
FLOORS, INC., BR CUSTOM SURFACE, REAL WOOD FLOORS, LLC,
GALLEHER CORP., DPR INTERNATIONAL, LLC:**

William Perry
Dorsey & Whitney LLP
Suite 6100
701 Fifth Avenue
Seattle, WA 98104
perry.william@dorsey.com

**On behalf of THE COALITION FOR AMERICAN HARDWOOD PARITY**:

Jeffrey Steven Levin, Esq.
Levin Trade Law PC
7800 Beech Tree Road
Bethesda, MD 20817
JeffLevin@levintradelaw.com

/s/ David B. Fishberg
David B. Fishberg
Attorney Advisor
U.S. International Trade Commission
500 E Street, SW,
Washington, DC  20436
tel. (202) 708-2614
fax (202) 205-3111
david.fishberg@usitc.gov

**CERTIFICATE OF COMPLIANCE
PURSUANT TO FED. R. APP. P. 32(a)(7)(C)**

Pursuant to Fed. R. App. P. 32(a)(7)(B), I hereby certify that the attached brief contains 13,223 words, according to the word-count function of the word-processing system used to prepare the brief (Microsoft Word 2010).

/s/ David B. Fishberg
David B. Fishberg

Dated: January 28, 2015

# Addendum

# URUGUAY ROUND TRADE AGREEMENTS, TEXTS OF AGREEMENTS, IMPLEMENTING BILL, STATEMENT OF ADMINISTRATIVE ACTION, AND REQUIRED SUPPORTING STATEMENTS

---

## MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

THE URUGUAY ROUND TRADE AGREEMENTS, TEXTS OF AGREE-MENTS IMPLEMENTING BILL, STATEMENT OF ADMINISTRATIVE ACTION AND REQUIRED SUPPORTING STATEMENTS



SEPTEMBER 27, 1994.—Message and accompanying papers referred to the Committees on Ways and Means, Agriculture, Education and Labor, Energy and Commerce, Foreign Affairs, Government Operations, the Judiciary, and Rules and ordered to be printed

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1994

83–211

For sale by the U.S. Government Printing Office

- in a changed circumstances review, the margin(s) most recently determined by Commerce; and

- in a five-year review, the margin(s) determined by Commerce pursuant to its own sunset analysis under section 752(c)(3).

In final staggered investigations, the Commission is to use Commerce's final margins as to the pending investigations. For other investigations for which cumulation is appropriate, the Commission is to use the most recent dumping margin issued by Commerce at the time the Commission closes its record. This precludes challenges to a Commission determination on the basis that Commerce later modifies the original dumping margin.

Changes in the original margin could occur due to further proceedings in staggered investigations, corrections of ministerial errors, reconsideration of a determination, or judicial remand. Absent this provision, Commission determinations could be subject to repeated requests for reconsideration or judicial remands. The finality of injury determinations would be seriously compromised if the Commission were required to amend or revisit its determination each time the administering authority modified its dumping margin. The Commission, however, may conduct a changed circumstances review of its determination pursuant to Section 751(b) on the basis of recalculations by Commerce of the dumping margin in the original investigation, if the party seeking such review establishes that it is warranted. Changes in dumping margins in administrative reviews should not form the basis for a changed circumstances review.

### c. Causation

Article 3.5 of the Antidumping Agreement and 15.5 of the Subsidies Agreement do not change the causation standard from that provided in the 1979 Tokyo Round Codes. Existing U.S. law and legislative history fully implement the causation standard of the 1979 Codes. Thus, existing U.S. law fully implements Articles 3.5 and 15.5. Articles 3.5 and 15.5 do include new language requiring WTO signatories to "examine all relevant evidence" including "any known factors, other than the dumped [or subsidized] imports which at the same time are injuring the domestic industry." The obligations embodied in the new language are reflected in the existing statute and legislative history.

The GATT 1947 Panel Report in the Norwegian Salmon case approved U.S. practice as consistent with the 1979 Codes. The panel noted that the Commission need not isolate the injury caused by other factors from injury caused by unfair imports. *See* GATT Committee on Anti-dumping Practices, United States -- Imposition of Anti-dumping Duties on Imports of Fresh and Chilled Atlantic Salmon from Norway: Report on the Panel Par. 555 (Nov. 30, 1992); GATT Committee on Subsidies and Countervailing Measures, United States -- Imposition of Countervailing Duties on Imports of Fresh and Chilled Atlantic Salmon from Norway: Report on the Panel Par. 321 (Dec. 4, 1992). Rather, the

Commission must examine other factors to ensure that it is not attributing injury from other sources to the subject imports.

### d. Captive Production

Under section 777(7)(C)(iii), the Commission evaluates the relevant economic factors within the context of the business cycle and the conditions of competition that are distinctive to the affected industry. Among the factors that the Commission must evaluate in determining whether a domestic industry is materially injured by reason of unfairly-traded imports are penetration of the U.S. market by those imports and the financial performance of the U.S. producers included in the industry. Section 222(b)(2) of the bill adds section 771(7)(C)(iv) to the Act to amend current law with respect to import penetration and financial performance to address situations in which vertically-integrated U.S. producers sell a significant volume of their production of the domestic like product to U.S. customers (*i.e.*, the merchant market) and internally transfer a significant volume of their production of that same like product for further internal processing into a distinct downstream article (*i.e.*, captive production). No conforming changes to the other provisions of the Tariff Act of 1930, as amended, are necessary.

If the captive production provision applies, the Commission will focus primarily on the merchant market in analyzing the market share and financial performance of the domestic industry. The provision does not require the Commission to focus exclusively on the merchant market in its analysis of market share and financial performance. The basis for this analysis is the recognition that, in such a captive production situation, the imports compete primarily with sales of the domestic like product in the merchant market, not with the inventory internally-transferred for processing into a separate downstream article. This provision is consistent with the Antidumping and Subsidies Agreements.

Captive production refers to production of the domestic like product that is not sold in the merchant market and that is processed into a higher-valued downstream article by the same producer. Selling in the merchant market refers to sales of the domestic like product to unrelated customers. A downstream article is an article distinct from the domestic like product but is produced from that product. (It is not necessarily a "downstream product" within the meaning of section 780(d)). The Commission will determine on a case-by-case basis whether the volume sold in the merchant market and internally transferred is significant. Captive production and merchant sales are significant if they are of such magnitude that a more focused analysis of market share and financial performance is needed for the Commission to obtain a complete picture of the competitive impact of imports on the domestic industry.

The captive production provision is applicable if the Commission, in addition to finding that the volumes of the domestic like product sold in the merchant market and transferred internally for processing into a distinct downstream article are significant, also finds that: (1) the production of the domestic like product internally transferred for further

will publish a proposed schedule including the Commission's proposal for grouping reviews. After considering the comments, the Commission will determine which transition orders will be grouped, and Commerce will determine the review schedule. As with the grouping of reviews, the determination of the sequence of reviews of transition orders will be committed to agency discretion.

### c. Standards for Determining Likelihood of Continuation or Recurrence of Injury, Countervailable Subsidies, or Dumping

Section 221(a) of the bill adds new section 752 which establishes standards to be applied by Commerce and the Commission in conducting changed circumstances and five-year reviews. Specifically, section 752 elaborates on the standards for determining whether revocation of an order or termination of a suspended investigation would be likely to lead to a continuation or recurrence of injury, countervailable subsidies, or dumping.

The determination called for in these types of reviews is inherently predictive and speculative. There may be more than one likely outcome following revocation or termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of dumping or countervailable subsidies, or injury, is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order or suspended investigation will be continued.

### (1) Likelihood of Injury

#### (a) General Rules

Under the likelihood standard in new section 752(a)(1), the Commission must decide the likely impact in the reasonably foreseeable future of an important change in the status quo -- the revocation of an order or termination of a suspended investigation and the elimination of the restraining effects of that order or suspended investigation on volumes and prices of imports. The likelihood of injury standard applies regardless of the nature of the Commission's original determination (material injury, threat of material injury, or material retardation of an industry). Likewise, the standard applies to suspended investigations that were never completed.

The likelihood of continuation or recurrence of material injury standard is not the same as the standards for material injury and threat of material injury, although it contains some of the same elements. Under the material injury standard, the Commission determines whether there is current material injury by reason of imports of subject merchandise. Under the threat of material injury standard, the Commission decides whether injury is imminent, given the status quo. By comparison, under the likelihood

standard, the Commission will engage in a counter-factual analysis: it must decide the likely impact in the reasonably foreseeable future of an important change in the status quo -- the revocation or termination of a proceeding and the elimination of its restraining effects on volumes and prices of imports.

The likelihood of continuation or recurrence of material injury standard is prospective in nature, and, thus, a separate determination regarding current material injury is not necessary. Nonetheless, the Commission may consider relevant factors such as current and likely continued depressed shipment levels and current and likely continued prices for the domestic like product in the U.S. market in making its determination of the likelihood of continuation or recurrence of material injury if the order is revoked. In appropriate circumstances, the Commission may make an affirmative determination notwithstanding the lack of any likely further deterioration of the current condition of the domestic industry if revocation of the order, or termination of a suspended investigation, would be likely to lead to the continuation or recurrence of material injury.

Subparagraphs (A) through (D) of new section 752(a)(1) list the factors that the Commission must take into account in conducting a likelihood of injury analysis. Under subparagraph (A), the Commission must consider its prior injury determination(s), including the volume, price effect, and impact of imports on the industry during the period preceding the issuance of an order or acceptance of a suspension agreement. This consideration is important, because this period is the most recent time during which imports of subject merchandise competed in the U.S. market free of the discipline of an order or agreement. If the Commission finds that pre-order or pre-agreement conditions are likely to recur, it is reasonable to conclude that there is likelihood of continuation or recurrence of injury. Section 226(a)(1) of the bill amends section 777(b)(1) of the Act to expressly allow proprietary information submitted in connection with an investigation or review to be used by the agency to which the information originally was submitted in a changed circumstances or sunset review under section 751(b) or (c) involving the same subject merchandise.

Under subparagraph (B), the Commission must consider whether there has been any improvement in the state of the domestic industry that is related to the imposition of the order or the acceptance of a suspension agreement. The Commission should not determine that there is no likelihood of continuation or recurrence of injury simply because the industry has recovered after the imposition of an order or acceptance of a suspension agreement, because one would expect that the imposition of an order or acceptance of a suspension agreement would have some beneficial effect on the industry. Moreover, an improvement in the state of the industry related to an order or suspension agreement may suggest that the state of the industry is likely to deteriorate if the order is revoked or the suspended investigation terminated.

Under subparagraph (C), the Commission must consider whether the domestic industry is vulnerable to injury if the order is revoked or the suspended investigation terminated. The term "vulnerable" relates to susceptibility to material injury by reason of dumped or subsidized imports. This concept is derived from existing standards for material injury and threat of material injury. See H.R. Rep. No. 317, 96th Cong., 1st Sess. 47 (1979); H.R. Conf. Rep. No. 1156, 98th Cong., 2d Sess. 174, 175 (1984). In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury. While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports. In threat determinations, the Commission must carefully assess current trends and competitive conditions in the marketplace to determine the probable future impact of imports on the domestic industry and whether the industry is vulnerable to future harm.

If the Commission finds that an industry is vulnerable to injury from subject imports, it may determine that injury is likely to continue or recur, even if other causes, as well as future imports, are likely to contribute to future injury. If the Commission finds that the industry is in a weakened state, it should consider whether the industry will deteriorate further upon revocation of an order or termination of a suspended investigation. It also should consider whether such a weakened state is due to the possible ineffectiveness of the order or suspension agreement or its circumvention.

When an importer is affiliated with the exporter, dumping is measured by reference to the affiliated importer's resale price. However, it is the affiliated importer, not the unaffiliated U.S. purchaser of the dumped goods, who must pay the antidumping duty. Under certain circumstances, the affiliated importer may choose to pay the antidumping duty rather than eliminate the dumping, either through lowering prices in the foreign market, raising prices in the United States, or a combination of both.

During an administrative review initiated two or four years after the issuance of an order, Commerce will examine, if requested, whether absorption has taken place by reviewing data on the volume of dumped imports and dumping margins. Duty absorption is a strong indicator that the current dumping margins calculated by Commerce in reviews may not be indicative of the margins that would exist in the absence of an order. Once an order is revoked, the importer could achieve the same pre-revocation return on its sales by lowering its prices in the U.S. in the amount of the duty that previously was being absorbed. The duty absorption inquiry would not affect the calculation of margins in administrative reviews. This new provision of law is not intended to provide for the treatment of antidumping duties as a cost.

An affirmative finding of absorption in an administrative review initiated two years after the issuance of an order is intended to have a deterrent effect on continued absorption of duties by affiliated importers; if they engage in duty absorption, they will know that they will face an additional hurdle that will make it more difficult to obtain

revocation or termination. If, in the four-year review, Commerce finds that absorption has taken place, it will take that into account in its determination regarding the dumping margins likely to prevail if an order were revoked.

Commerce will inform the Commission of its findings regarding duty absorption, and the Commission will take such findings into account in determining whether injury is likely to continue or recur if an order were revoked. Duty absorption may indicate that the producer or exporter would be able to market more aggressively should the order be revoked as a result of a sunset review. Thus, the Commission is to consider duty absorption in determining whether material injury is likely to continue or recur.

Also, Commerce has full authority under its current regulations (19 CFR 353.26) to increase the duty when an exporter directly pays the duties due, or reimburses the importer, whether independent or affiliated, for the importer's payment of duties. Commerce intends no change in its practice in this area, which is to instruct Customs to double the duties if the importer fails to furnish a certificate of non-reimbursement to Customs prior to liquidation of entries.

     (b)  Volume, Price, and Impact of Imports on the Domestic Industry

Paragraphs (2), (3), and (4) of new section 752(a) adapt the standard volume, price effect, and impact factors contained in the Agreements for normal injury analysis to likelihood of injury analysis. Thus, in five-year and changed circumstances reviews, the Commission is required to consider the likely volume of imports, the likely price effects of imports, and the likely impact of imports on the domestic industry if the order were revoked or the suspended investigation terminated. In addition, specific factors applied by the Commission in its threat of injury analysis have been adapted for purposes of determining the likely volume, price and impact of subject imports in the event of revocation or termination.

     (c)  Basis for Determination

New section 752(a)(5) establishes the basis for making a likelihood of continuance or recurrence of material injury determination. As in the case of injury and threat determinations, the Commission must consider all factors, but no one factor is necessarily dispositive. In particular, the Commission need not determine that both the volume and price effects of imports are likely to be significant to determine that material injury is likely within a reasonably foreseeable time. Consistent with its practice in investigations, in considering the likely price effects of imports in the event of revocation or termination, the Commission may rely on circumstantial, as well as direct, evidence of the adverse effects of unfairly traded imports on domestic prices.